*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DOUGLAS EDWIN BALL JR.,

Defendant-Appellant.

UNPUBLISHED
May 30, 2019

No. 339131
St. Clair Circuit Court
LC No. 16-002322-FC

Before: STEPHENS, P.J., and GLEICHER and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of first degree murder, MCL 750.316, under multiple theories: (a) premeditation (MCL 750.316(1)(a)) and (b) felony murder (MCL 750.316(1)(b)), and of torture, MCL 750.85. The offense of torture was the predicate felony for purposes of establishing first-degree murder under a felony murder theory. He was sentenced as a second offense habitual offender, MCL 769.10, to life imprisonment for the murder charge and 19 to 30 years' imprisonment for the torture charge. We affirm.

## I. BACKGROUND

Defendant's convictions arise from the death of his wife Lydia Ball that occurred in the basement of the home, which they shared with their five-year-old son and her parents, Larry and Roxanne. Lydia was last seen alive in the home on the night of August 18, 2016. The next morning defendant told Lydia's parents that Lydia had risen early to apply for a job. Throughout the day of August 19, defendant told Lydia's parents that he was receiving text messages from Lydia. He reported to them that Lydia was out with a friend and later that night that Lydia had decided to stay over at the friend's house. The following morning, defendant told Lydia's parents that Lydia needed to be picked up from her friend's house an hour and a half away. When her parents left, defendant packed up their son's belongings and took multiple items from the house to a local pawnshop. After pawning the items, defendant drove to his mother's place of employment and asked her if he could stay at her home. Defendant told his mother that he and Lydia had an argument, and that out of fear of losing his son he was considering going to Tennessee. Lydia's parents followed the directions given by the defendant to retrieve Lydia but

-1-

discovered that the address was to the Ira Township Fire Department. When they returned, Roxanne discovered Lydia's body in the basement with a bag over her head and bound at the hands and feet. Roxanne testified that it appeared as if bleach had been poured over Lydia's clothes. Defendant was arrested at his mother's home the following day, August 20.

The trial testimony from the medical examiner was that Lydia was struck 14 times in the scalp with a heavy blunt object that left a pattern similar to that of the homemade mallet discovered near her body. Without objection, law enforcement witnesses testified that defendant's cellular phone had not received text messages from Lydia asking to be picked up from Ira Township. Further, the friend whom defendant said Lydia was with testified that she had not seen Lydia in months and was not with her on the days in question. Lydia's cellphone was never recovered, however phone records established that all but one of the texts sent from her phone to defendant's phone were affiliated with a tower near her parent's residence. Other evidence was presented including several bottles of bleach found during the crime scene investigation. The jury found defendant guilty of first-degree murder and torture. He appeals from these convictions.

## II. SUFFICIENCY OF THE EVIDENCE, INSTRUCTIONAL ERROR AND VERDICT UNANIMITY

Defendant first argues that there was insufficient evidence to support his conviction for torture, and therefore that it is impossible to know whether the jury reached a unanimous verdict on the first-degree murder conviction.

### A. STANDARDS OF REVIEW

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). "We examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *Id*. at 196. "Circumstantial evidence and reasonable inferences therefrom may be sufficient to prove all the elements of an offense beyond a reasonable doubt." *People v Schumacher*, 276 Mich App 165, 167; 740 NW2d 534 (2007). "[I]n reviewing a sufficiency-of-the-evidence claim, we must defer to the fact-finder by drawing all reasonable inferences and resolving credibility conflicts in support of the jury verdict." *Id*.

We also review claims of instructional error and issues of constitutional and statutory interpretation de novo. *People v Kowalski*, 489 Mich 488, 501; 803 NW2d 200 (2011); *People v Gayheart*, 285 Mich App 202, 207; 776 NW2d 330 (2009).

### B. ANALYSIS

Defendant challenges his conviction for torture on the ground that there was insufficient evidence that he tortured Lydia. He additionally argues that if this Court agrees that there was insufficient evidence of torture, it should also find that the trial court committed reversible error by allowing the jury to deliberate on multiple theories of first degree murder, i.e., felony murder and premeditated murder, to convict him. Defendant contends that if there was insufficient

evidence of torture, then it would be impossible to determine under which theory of murder the jury convicted him, thereby denying him his right to a unanimous verdict.

At trial, defendant requested the jury be given Criminal Jury Instruction 16.25; an instruction that the jury's verdict must be unanimous with respect to premeditated murder or felony murder.[1] The court denied defendant's request and the jury was instructed that defendant was "charged with the crime of first degree murder under either the legal theory of premeditated murder or felony murder."

Michigan law provides criminal defendants the right to a unanimous jury verdict. MCR 6.410(B). "In order to protect a defendant's right to a unanimous verdict, it is the duty of the trial court to properly instruct the jury regarding the unanimity requirement." *People v Cooks*, 446 Mich 503, 511; 521 NW2d 275 (1994). Typically, this duty is fulfilled when the trial court provides the jury with a general instruction on unanimity. *Id*. at 512. "A general verdict of guilty is erroneous when the offenses charged are separate and distinct in character, provable by substantially different evidence, and punishable by different penalties." *People v Fullwood*, 51 Mich App 476, 481; 215 NW2d 594 (1974). On the other hand, "where materially identical evidence is presented with respect to each act, and there is no juror confusion, a general unanimity instruction will suffice." *Cooks*, 446 Mich at 512-513.

The court was not required to give a specific unanimity instruction in defendant's case because there was sufficient evidence to establish both first-degree premeditated murder and felony murder, the charges were proved by substantially the same evidence, and there was no evidence of juror confusion. The elements of premeditated first-degree murder are that the defendant killed the victim and that the killing was either "willful, deliberate, and premeditated." MCL 750.316(1)(a); *People v Bowman*, 254 Mich App 142, 151; 656 NW2d 835 (2002).

---

[1] M Crim JI 16.25 provides:

> (1) You have been instructed on the two types of first-degree murder. Those two types are premeditated murder and felony murder.
>
> (2) A verdict in a criminal case must be unanimous. To be unanimous, each of you must agree upon which type of first-degree murder has been proved or that both types of first-degree murder have been proved.
>
> (3) If you return a verdict of guilty of first-degree murder, your unanimous verdict must specify whether all of you have found the defendant guilty of:
>
> (a) premeditated murder, or
>
> (b) felony murder, or
>
> (c) both.

Viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to support that defendant was Lydia's murderer. The exact time of Lydia's death was unknown. Dr. Spitz opined that the timeframe however, was narrow, being sometime between August 18, when Lydia was last seen alive, "[p]ossibly going into the 19th." The evidence supports that only the defendant, his five-year-old son, Larry and Roxanne were in the home during that period. Expert testimony established that Lydia was murdered in the basement and her body was found there on August 20. According to the testimony of Lydia's parents, the defendant was the only person with access to the basement between the afternoon of April 18 until August 19. Specifically, Roxanne testified that the defendant prohibited her from entering the basement when she wanted to do laundry. Defendant's fingerprints were found on those trash bags containing bleach recovered by the police. The victim's blood was found on clothing connected to the defendant. A footprint matching the defendant's was found in the basement near the body of the deceased. There was also evidence presented that at some point Lydia's blood came in contact with the defendant's fingers. Additionally, defendant's only theories, that Lydia was killed by an outside intruder or by their brother Edward, were unsupported. There was no evidence of outside entry by an intruder and Edward's alibi that he was at work or at home during the period at issue was supported by his employer and roommates.

There was also sufficient evidence of premeditation in defendant's case. To "premeditate" is to "think about beforehand" and to "deliberate" is to "measure and evaluate the major facets of a choice or problem." *People v Bass*, 317 Mich App 241, 266; 893 NW2d 140 (2016) (quotation marks and citation omitted). Premeditation "may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.' " *People v Oros*, 502 Mich 229, 242; 917 NW2d 559 (2018) quoting *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003); *People v Tilley*, 405 Mich 38, 45; 273 NW2d 471 (1979). The jury could first infer premeditation from the weapon used in the killing. *People v Jackson*, 171 Mich App 191, 199; 429 NW2d 849 (1988). Dr. Spitz concluded that Lydia's scalp injuries, which led to her death, were caused by the welding hammer found in the basement near her body. Both defendant and Lydia's brother Edward owned a welding hammer. Edward identified the hammer found near Lydia's body as his. Both Edward and Larry testified that Edward's hammer was last seen in Larry's vehicle where it was normally kept because Larry had driven Edward and defendant to work. Edward had since moved out of his parents' home, was no longer working as a welder, and had left his mallet behind in the vehicle. No one testified to having brought the hammer into the house nor was there testimony that the vehicle had been broken into to support anyone else having had possession of it. The jury could infer that defendant, who still lived with Edward's parents in their home with Lydia, had access to the murder weapon. Premeditation could be established either by the time that it took to retrieve the weapon or in the decision and plan to take the weapon to the basement to murder Lydia. Lydia's defensive wounds, in the form of bruises and abrasions on her fingers, hands and arms, were further evidence of premeditation. *People v Johnson*, 460 Mich 720, 733; 597 NW2d 73 (1999). The time in which Lydia was defending herself was the same time allotted defendant to measure and evaluate his actions. "[E]vidence that a victim sustained multiple violent blows may support an inference of premeditation and deliberation" as well. *People v Unger*, 278 Mich App 210, 231; 749 NW2d 272 (2008). Dr. Spitz testified that Lydia suffered "14 severe lacerating wounds" to her scalp. Again, each blow to the head was an interval of time in which defendant could take a second look. This Court has also held that evidence of a struggle between the defendant and the victim

can be evidence of premeditation and deliberation. *People v Johnson*, 460 Mich 720, 733; 597 NW2d 73 (1999). Here, law enforcement and Dr. Spitz observed that Lydia's pants were torn from the back. Roxanne testified that items she kept stored in the basement were knocked over on the floor. Forensic scientists noted blood spatter in multiple areas throughout the basement. This evidence showed that a struggled ensued between defendant and Lydia. It also supported the jury finding that defendant had time to think beforehand.

A substantial amount of circumstantial evidence showing consciousness of guilt was also submitted to the jury. The jury was allowed to infer consciousness of guilt from evidence of defendant's lying and deception as to Lydia's whereabouts. *Unger*, 278 Mich App at 227. Defendant's effort to destroy evidence of the murder with bleach also showed consciousness of guilt. See *People v Usher*, 121 Mich App 345, 351; 328 NW2d 628 (1982), overruled in part on other grounds *People v Perry*, 460 Mich 55, 64-65; 594 NW2d 477 (1999). Evidence that defendant fled the home after Lydia's parents left and told his mother he intended to leave the state further inferred consciousness of guilt. *People v McGhee*, 268 Mich App 600, 613; 709 NW2d 595 (2005). "Michigan authority appears uniform in holding that actions by the defendant such as flight to avoid lawful arrest, procuring perjured testimony and attempts to destroy evidence, while possibly as consistent with innocence as with guilt, may be considered by the jury as evidence of guilt." *People v Casper*, 25 Mich App 1, 7; 180 NW2d 906 (1970).

Viewing the evidence in a light most favorable to the prosecution, it was sufficient for the jury to find that defendant premeditated Lydia's murder.

"The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). The predicate felony relied on by the prosecution was torture. A person is guilty of torture if "with the intent to cause cruel or extreme physical or mental pain and suffering, [he] inflicts great bodily injury or severe mental pain or suffering upon another person within his . . . custody or physical control...." MCL 750.85(1).

There was sufficient evidence of the underlying felony of torture for the jury to find defendant guilty both of that underlying offense and of first-degree murder under a felony murder theory. Defendant concedes that Lydia's injuries support finding that there was the intent to cause extreme physical pain and suffering, and that great bodily injury was inflicted. Defendant therefore disputes only that Lydia was under his custody and control. MCL 750.85 defines "custody or physical control" as "the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority." MCL 750.85(2)(b). Defendant argues that the statute requires that the element of "forcible restriction or forcible confinement" be construed as separate acts from the attack itself. Defendant cites no authority for this interpretation and when plainly read, there is no temporal requirement in the statute. Defendant's choice of location to commit the murder as well as evidence at the crime scene however support finding that Lydia's movements were forcibly restricted or confined.

The evidence of confinement was significant. Defendant and Lydia lived with their son and Lydia's parents. Confining Lydia to a single area was necessary to avoid detection and complete the murder in the home. Forensic Scientists Shane Hill and Teresa Scott testified that the murder occurred in the basement. Edward and Roxanne testified that they would not have been able to hear anything occurring in the basement from the second story. The basement was an area of seclusion. The location was also easier for defendant to exert control over Lydia because there was only one way out, by use of the stairway, which was easy for defendant to block.

There was considerable evidence of the victim's struggle with her assailant. Dr. Spitz testified that the back waistband of Lydia's pants was torn. Hill and Scott testified that there was blood spatter throughout the basement. From this evidence, the jury could infer that Lydia tried to escape from defendant.

There was, also, evidence of torture. As noted above, the deceased was found bound. She was subjected to no less than 14 blows to the head. Contrary to defendant's position, this evidence also illustrates the forcible confinement of an active victim, and not someone who was unable to escape merely because she lay dying. At some point however, Lydia became inactive as implied by Dr. Spitz's testimony that the zip tie ligatures on Lydia's wrists and ankles indicated that she was no longer struggling at the time of their application. Dr. Spitz did not conclude that Lydia was already deceased when she was bound, rather only that there was no evidence of a struggle at that point. The use of zip ties was a clear application of force to restrict Lydia's movement and forcibly confine her to the basement. It would have been very difficult for Lydia to traverse the staircase with her feet and hands bound behind her. In this case, defendant prolonged the confinement by refusing to allow Roxanne entry to the basement to do laundry on August 19. Further, there was no evidence of jury confusion where defendant was separately charged and convicted of the crime of torture. The fact that the jury found defendant guilty of first-degree murder and the underlying felony used to charge him with felony murder supports that the jury found the theory of felony murder proved beyond a reasonable doubt.

## III. EVIDENTIARY ERROR

Defendant's shorts were admitted into evidence. The DNA analysis of those shorts was that the shorts had the blood of the deceased on them. Defendant argues that the trial court erred in allowing the admission of DNA evidence found on a pair of his blue gym shorts because there was no proper foundation laid to admit the evidence and Roxanne's handling of the shorts before their collection by forensic scientists contaminated the shorts and broke the chain of custody. We disagree.

## A. STANDARD OF REVIEW

Defendant acknowledges that he did not preserve his evidentiary challenge by contemporaneous objection below. We review for plain error affecting a defendant's substantial rights unpreserved evidentiary errors. *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003). Substantial rights are affected when the defendant is prejudiced, meaning the error affected the outcome of the trial. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). The burden is on defendant to demonstrate prejudice. *Id*.

B. ANALYSIS

The police establish a chain of custody by tracing the possession of an item from the time it was discovered until the time it was presented into evidence. *People v Prast*, 114 Mich App 469, 491; 319 NW2d 627 (1982). Admission of evidence "does not require a perfect chain of custody" and "any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility once the proffered evidence is shown to a reasonable degree of certainty to be what its proponent claims." *People v White*, 208 Mich App 126, 130-131; 527 NW2d 34 (1994). "A break in the chain of custody of evidence does not require automatic exclusion of the proffered evidence." *People v Jennings*, 118 Mich App 318, 322; 324 NW2d 625 (1982). In order to obtain the admission of real evidence, a prosecutor must lay a foundation identifying "[t]he object which was involved in the incident, and further that the condition of the object is substantially unchanged." *People v Beamon*, 50 Mich App 395, 398; 213 NW2d 314 (1973) citing McCormick, Evidence (2d ed), s 212, p. 527.

Defendant's contention that there was a break in the chain of custody is misplaced where his claim that the shorts were mishandled by Roxanne points to the time before the evidence was seized by law enforcement. *Prast*, 114 Mich App at 491. The chain of custody does not begin until the evidence is seized by police.

Defendant next challenges the forensic finding of Lydia's blood on his shorts by arguing the shorts were contaminated either by Roxanne or by their placement in the cardboard box. There was no evidence, however, that the shorts were contaminated by either. Roxanne testified that she found the shorts in the cardboard box and placed them in a Kroger bag by the front door before she went into the basement and found Lydia. There was no testimony that her hands got blood on them from contact with Lydia's body or that she handled the Kroger bag or shorts after she came up from the basement. Further, the shorts were later found by forensic scientist Lisa Mayfield in the same location as Roxanne testified she left them, near the front door in a Kroger bag. Defendant's argument that the shorts were contaminated by their placement in the box is also unsupported because forensic scientist Hill testified that he searched the large cardboard box and found mostly children's toys and nothing of evidentiary value.

The prosecutor laid the proper foundation for the DNA's admission. The testimony established that the defendant was wearing shorts with Lydia's blood on them around the time of her disappearance and murder. Further, the testimony established that Roxanne's handling of the shorts had not substantially changed their condition before they were collected by law enforcement. Defendant has thus not identified any error, much less outcome determinative error, on this record and the trial court did not err in allowing the DNA evidence to be admitted.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Elizabeth L. Gleicher
/s/ Mark T. Boonstra

-7-
